| | |
|---|---|
| PACIFIC HIDE & FUR DEPOT, a Montana corporation, n/k/a Pacific Steel & Recyling, | CV 12–36–BU–DLC |
| Plaintiff, | |
| vs. | ORDER |
| GREAT AMERICAN INSURANCE COMPANY, a Delaware corporation; and RESOLUTE MANAGEMENT INC., and NATIONAL INDEMNITY COMPANY, | |
| Defendants. | |

This order resolves three motions currently pending in this case: (1) Defendant Great American Insurance Company's ("Great American") motion for summary judgment; (2) Plaintiff Pacific Hide & Fur Depot's ("Pacific") motion for summary judgment regarding the duty to defend; and (3) Pacific's motion for summary judgment on Great American's remaining defenses.

For the reasons detailed herein, Great American breached its duty to defend, and the Court will grant summary judgment in favor of Pacific on that claim.

This is not the first case to come before the Court where an insurer has taken the high risk approach of denying a defense in the face of facts mandating

one. Considering the long-established and judicially approved alternative approach, which is to defend the insured and file a declaratory judgment action to determine coverage, it is mystifying that an insurer would continue to deny a defense to its insured in the face of a coverage question, particularly where the consequences are clear under Montana law, and can result in a judgment many times greater than the modest cost of the usual defense. This case presents, again, a clear example of the risk associated with this approach.

## I.  FACTS

From approximately 1956 to 1988, Pacific Hide leased a property in Bozeman, Montana that was part of what later became known as the CMC Bozeman Asbestos Site ("Site"). During that time, Pacific purchased numerous liability policies from Great American, which are the subject of this litigation.

In a letter dated January 2, 1996, the Montana Department of Environmental Quality ("MDEQ") notified Pacific that it had been identified as a potentially liable party ("PLP") under Montana's Comprehensive Environmental Cleanup and Responsibility Act ("CECRA"), Mont. Code Ann. § 75-10-705, *et seq.*, based on releases or threatened releases of hazardous or deleterious substances at the Site.

In a letter dated September 23, 2003, MDEQ offered Pacific and the other entities that it had identified as PLPs the opportunity to conduct either an interim

or permanent remediation at the Site. The letter stated, *inter alia*, that if Pacific chose not to conduct one of the remedial actions outlined therein, "DEQ may conduct the actions itself and recover its costs or it may issue an order or initiate a civil action requiring [Pacific] to perform the actions." (Doc. 63-5.) Pacific exchanged several letters with MDEQ regarding its CECRA liability between September 23, and December 2, 2003, but did not conduct either remedial action.

In a letter dated March 25, 2004, counsel for Pacific notified Great American that Pacific had been identified as a PLP at the Site, and that the City of Bozeman may assert a cost contribution claim against it. Pacific attached a schedule of fourteen policies it allegedly purchased from Great American, and requested that Great American defend and indemnify it from all claims arising from the Site.

Over a year later, in a letter dated April 27, 2005, Great American denied Pacific's request for defense and indemnity. On August 7, 2007, Pacific executed a stipulated consent judgment under which it agreed to a 15% allocation of liability for the Site, to be paid to the City of Bozeman as the party that undertook the MDEQ-mandated site cleanup. On July 13, 2010, Pacific executed an "Agreement and Release" with the City and tendered a check for $650,000, the amount that Pacific and the City agreed constituted Pacific's 15% allocation.

Pacific filed a complaint against Great American and the other Defendants in the Montana Eighteenth Judicial District Court on May 2, 2012, alleging breach of contract and bad faith claims handling practices. Century and Central National filed a notice of removal on June 8, 2012; Great American joined the notice on the same day. Following the preliminary pretrial conference on September 11, 2012, the Court bifurcated this litigation, with Phase I to deal with Counts I-VI, the breach of contract and declaratory judgment claims, and Phase II to deal with the remaining Counts. On October 15, 2013, the Court granted summary judgment in favor of Pacific on the issue of Great American's statute of limitations defense.

The Court now resolves the issue raised in Phase I: Whether Great American breached its duty to defend Pacific in the CECRA proceedings.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ. P. 56(a). The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986) (internal quotation marks omitted). The movant's burden is satisfied when the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Where the moving party has met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted).

### III.   THE DUTY TO DEFEND AND APPLICABLE LAW

This case presents two novel and interrelated questions of state law concerning the duty to defend that the Montana Supreme Court has yet to directly address, and that this Court must resolve before it can decide these motions on the merits. A federal court sitting in diversity applies the substantive law of the forum state to state law claims. *Mason and Dixon Intermodal, Inc. v. Lapmaster Intern. LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011). When an issue of state law arises and "the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Med. Laboratory Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002) (citations omitted). In doing so, the court must "look to existing state law without predicting potential changes in that law."

*Ticknor v. Choice Hotels Intl., Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (citation

omitted). The court should also rely on persuasive authorities, including treatises

and decisions from other jurisdictions, as guidance. *Strother v. S. Cal.*

*Permanente Med. Group*, 79 F.3d 859, 865 (9th Cir.1996).

"The duty to defend is independent from and broader than the duty to

indemnify created by the same contract." *Farmers Union Mut. Ins. Co. v. Staples*,

90 P.3d, 381, 385 (Mont. 2004) (citing *St. Paul Fire & Marine Ins. Co. v.*

*Thompson*, 433 P.2d 795, 599 (Mont. 1967)); *Grindheim v. Safeco Ins. Co.*, 908

F.Supp. 794, 800 (D. Mont. 1995). "The duty to defend arises when a complaint

against an insured alleges facts, which if proven, would result in coverage."

*Staples*, 90 P.3d at 385. "Where a complaint alleges facts which represent a risk

outside the coverage of the policy but also avers facts which, if proved, represent a

risk covered, the insurer is under a duty to defend." *Id.* (quoting *Atcheson v.*

*Safeco Ins. Co.*, 527 P.2d 549, 552 (Mont. 1974)). "When a court compares

allegations of liability advanced in a complaint with policy language to determine

whether the insurer's obligation to defend was 'triggered,' a court must liberally

construe allegations in a complaint so that all doubts about the meaning of the

allegations are resolved in favor of finding that the obligation to defend was

activated." *Id.* at 385 (citing *Portal Pipe v. Stonewall*, 845 P.2d 746, 749 (Mont.

1993)); *Grindheim*, 908 F.Supp at 805. "Unless there exists an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage, an insurer has a duty to defend." *Staples,* 90 P.3d at 385 (citing *Insured Titles, Inc. v. McDonald*, 911 P.2d 209, 212 (Mont. 1996)). "[I]f there is any dispute as to the facts relevant to coverage, those factual disputes must be resolved in favor of coverage." *Id.* (citing *Insured Titles, Inc.*, 911 P.2d at 212). When an insurer, instead of tendering a defense under a reservation of rights, unilaterally decides coverage issues in its own favor and refuses to defend, "the insurer proceeds at its own risk." *Id.* at 386. When an insurer unjustifiably breaches its duty to defend, the insurer becomes liable for defense costs and judgments. *Id.* (citing *Lee v. USAA Cas. Ins. Co.*, 86 P.3d 562, 565 (Mont. 2004)).

## IV.  QUESTIONS OF LAW

### A.  PLP Notices Issued Pursuant to CECRA are "Suits" Under the Great American Policies

Under Montana law, "[i]n the interpretation of a contract of indemnity, the rules prescribed in [Montana Code Annotated sections] 28-11-314 through 28-11-317 are to be applied unless a contrary intention appears." Mont. Code Ann. § 28-11-313. Montana Code Annotated § 28-11-316 states that with respect to the "[d]uty of person indemnifying to defend," the,

person indemnifying is bound, on request of the person indemnified, to defend against actions or proceedings brought against the person indemnified in respect to the matters embraced by the indemnity . . . . If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the person indemnified suffered by the person indemnified in good faith is conclusive in favor of the person indemnified against the person indemnifying.

There are numerous policies allegedly issued to Pacific by Great American, with coverage spanning from November 1963 through December 1977. For the purposes of these motions, and to avoid an issue of dispute between the parties, the Court will limit its discussion and analysis to five policies whose existence and contents the parties have agreed upon (the "proven policies").[1] The proven policies cover the period from December 20, 1966, through December 20, 1971.They are identical in many respects, including the provision governing Great American's duty to defend, which reads:

With respect to such insurance as is afforded by this policy, the company shall . . . have the right and duty to defend any suit against the insured seeking damages on account of . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient . . . .

---

[1]     The proven policies are: SLP 1796232 (Doc. 119-4); SLP1800499 (Doc. 119-5); SLP 2013421 (Doc. 119-6); SLP 2014187 (Doc. 119-7); SLP 5259998 (Doc. 119-8).

(Docs. 119-4 at 4; 119-5 at 7; 119-6 at 6; 119-7 at 5; 119-8 at 7.)

Great American argues that because no "suit" or "complaint" was filed, it had no duty to defend at the time of Pacific's March 25, 2004 claim letter, which was based only on a series of letters from the MDEQ and a potential cost recovery action by Bozeman. While the parties raise numerous issues in the multiple briefs now before the Court, Pacific's claim for breach hinges on whether, in the absence of a "suit," notice that the insured has been identified as a PLP under CECRA and requested to take further action is sufficient to trigger the duty to defend under Montana law and the insurance contracts at issue here.

While the Montana Supreme Court has not addressed whether MDEQ notice to an insured that it has been identified as PLP triggers the insurer's duty to defend, the Ninth Circuit addressed a similar question under Idaho law in the seminal case of *Aetna Casualty and Surety Company, Inc. v. Pintlar Corporation*, which was whether EPA notice that a party has been identified as a Potentially Responsible Party ("PRP") under the Federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")[2] triggered an insurer's duty to defend "any suit against the insured" under CGL policies, absent an underlying complaint. 948 F.2d 1507, 1516 (9th Cir. 1991). In October of 1984,

---

[2]    Public Law 96-510, codified at 42 U.S.C. § 9601 (2012), *et seq.*

the EPA notified Gulf Resources & Chemical Corporation and its subsidiary

Pintlar Corporation (collectively, "Gulf") that it was deemed to be a PRP in

connection with the contamination of a plot of land in Idaho known as the Bunker

Hill Site. *Id.* at 1509. The EPA did not immediately file a civil action against Gulf,

choosing instead to pursue administrative remedies available under CERCLA. In

August of 1986, EPA and Gulf entered negotiations regarding Gulf's participation

in the remedial investigation and feasibility study of the Bunker Hill Site. At that

point, if Gulf had refused to perform the study, the EPA could order it to do so, or

could opt to perform the study itself and then sue for reimbursement. After

discovering it was a PRP and following its negotiations with the EPA, Gulf sought

defense and indemnity from its insurers in connection with the EPA's claims.

The policies at issue in *Pintlar* provide, in relevant part:

> [T]he company shall have the right and duty to defend any
> suit against the insured seeking damages on account of
> such . . . property damage, even if any of the allegations of
> the suit are groundless, false or fraudulent, and may make
> such investigation and settlement of any claim or suit as it
> deems expedient . . . .

*Id.* at 1510, 1516. This is identical to the duty to defend provisions in the proven

policies, quoted above. The insurers brought declaratory judgment actions seeking

relief from any liability, and the United States District Court for the District of

Idaho granted the insurers' motions for summary judgment, finding as a matter of law that there was no duty to defend because the policies "state that the duty to defend is triggered by a 'suit' – not 'claim,' not 'administrative proceeding,' but suit. Since no complaint has been filed against defendants by EPA, there is no suit. Thus, under the plain meaning of the policy terms, no duty to defend has been triggered." *Aetna Cas. & Sur. Co. v. Gulf Resources & Chem. Corp*., 709 F.Supp 958, 960 (D. Idaho 1989), *rev'd sub nom.*, *Aetna Cas. & Sur. Co., Inc. v. Pintlar Corp.*, 948 F.2d (9th Cir. 1991).

The Ninth Circuit reversed, holding that the EPA's administrative claims against the Gulf did in fact trigger the insurers' duty to defend. *Pintlar*, 948 F.2d at 1517. Due to the critical role *Pintlar* plays in resolving the question now before the Court, a thorough recitation of the Ninth Circuit's rationale is warranted:

> Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insureds' rights. However, in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process. *Avondale Industries, Inc. v. Travelers Indem. Co.,* 697 F.Supp. 1314, 1321 (S.D.N.Y.1988) ("Adverse consequences can befall an insured during the administrative pollution cleanup process."), *aff'd,* 887 F.2d 1200 (2d Cir.1989).

The extent of CERCLA liability is far-reaching. The ability to choose the response action greatly empowers the government. In order to influence the nature and costs of the environmental studies and cleanup measures, the PRP must get involved from the outset. In many instances, it is more prudent for the PRP to undertake the environmental studies and cleanup measures itself than to await the EPA's subsequent suit in a cost recovery action.

There are many incentives to cooperate with the EPA. For instance, pursuant to 42 U.S.C. § 9607(c)(3), if a person who is liable for a release or threat of release of a hazardous substance fails to "properly provide removal or remedial action upon order of the President, pursuant to section 9604 or 9606 of this title," the EPA can choose to proceed with a Superfund-financed cleanup, and then seek punitive damages. Lack of cooperation may expose the insured, and potentially its insurers, to much greater liability, including the EPA's litigation costs.

As a result, an "ordinary person" would believe that the receipt of a PRP notice is the effective commencement of a "suit" necessitating a legal defense. The PRP letter forced Gulf to hire technical experts and lawyers to protect its interests in connection with EPA's actions. Moreover, if the receipt of a PRP notice is held not to trigger the duty to defend under CGL policies, then insureds might be inhibited from cooperation with the EPA in order to invite the filing of a formal complaint.

Id. at 1516-17.

We hold that the EPA's administrative claims against the insureds triggered insurers' duty to defend. Coverage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to

litigation. A fundamental goal of CERCLA is to encourage and facilitate voluntary settlements. *Interim Guidance on Notice Letters, Negotiations, and Information Exchange,* EPA Memorandum, 53 Fed.Reg. 5298 (1988). It is in the nation's best interests to have hazardous waste cleaned up effectively and efficiently. But the insured is not required to submit to, and may in fact wish to oppose the threat. In either event, the insurer's duty to defend may well be triggered.

Further, we do not agree with insurers' complaints of obliteration of a bright-line test. The rationale behind defending insureds when a complaint has been filed is that, traditionally, that is when the jeopardy to the insureds' rights can be adversely affected. The focus should be on the underlying rationale and not on the formalistic rituals. If the threat is clear then coverage should be provided. The filing of an administrative claim is a clear signal that legal action is at hand.

*Id.* at 1517-18.

In 2013, the Ninth Circuit revisited and reaffirmed its holding in *Pintlar*, stating that it was one of the first among "the huge majority of U.S. Courts" which now "hold that a policyholder's receipt of a PRP notice from the U.S. EPA . . . is the 'functional equivalent' of a 'suit.'" *Anderson Bros. v. St. Paul Fire and Marine Ins. Co.*, 729 F.3d 923, 930 (9th Cir. 2013) (citing *Land O' Lakes, Inc. v. Employers Mut. Ins. Co. Of Wis.*, 846 F.Supp.2d 1007, 1020 (D. Minn. 2012)).[3] At

---

[3]     In *Anderson*, the Court went on to specify that "*Pintlar* clearly held that the duty to defend was triggered *by the General Notice Letter*, not by any subsequent communications between Pintlar and the EPA." 729 F.3d 923, n. 6 (citing *Pintlar*, 948 F.2d at 1517 ("An 'ordinary person' would believe that the receipt of a PRP notice is the effective commencement of a 'suit' necessitating legal defense") (emphasis in original)). Since Pacific's request for a

this time, "[a]lthough courts are divided on this issue, the very strong majority view is that a policyholder's receipt of a PRP letter imposes a duty to defend on the insurer." 2 Envtl. Ins. Litig.: L. and Prac. § 12:34 (2013).

In the passages quoted above, *Pintlar* sets forth a resoundingly logical, but largely theoretical explanation as to why the alternate and more formalistic answer to this question is untenable, while the Wisconsin Supreme Court's disposition of this issue provides support for the decision in *Pintlar* based on practical experience. In 1994, that Court held that the issuance of letters by the EPA or the Wisconsin Department of Natural Resources that either requested or directed an insured to participate in the cleanup of a contaminated property pursuant to CERCLA, did not constitute a "suit" sufficient to trigger the insurer's duty to defend. *Edgerton v. General Cas. Co. of Wis.*, 517 N.W.2d 463 (Wis. 1994), *cert denied*, 514 U.S. 1017 (1995). Nine years later the Court reversed its position, holding that insurers do in fact have "a duty to defend an insured who receives a PRP letter from the EPA or equivalent state agency . . . provided the insured has coverage for the claim under the CGL policy," because such letters were the

_____

defense was based not on the initial 1996 PLP letter, but on subsequent letters in which MDEQ goes beyond mere notice and requests that Pacific take action, the Court declines to address whether general notice letters constitute "suits" in the CECRA context, in order to rule narrowly on an issue that the Montana Supreme Court has yet to address.

"functional equivalent of a suit." *Johnson Controls, Inc. v. Employers Ins. Of Wausau*, 665 N.W.2d 257, 284-85 (Wis. 2003). The Court's analysis and reasoning largely mirrors *Pintlar* and *Anderson Brothers*, but also contributes a compelling perspective that can only be gleaned from hard experience:

> Today the problems created by the *Edgerton* decision have become so obvious and so acute that they cannot be ignored. . . . We [] created an unworkable interpretation of the insurer's duty to defend in the specialized context of CERCLA letters and orders. The process of restoring consistency and coherence to the law must begin by overruling the *Edgerton* decision.

*Johnson Controls, Inc.*, 665 N.W.2d at 263.

It is clear that a CERCLA administrative action, initiated by a PRP notice, constitutes a "suit" sufficient to trigger the duty to defend. *Pintlar*, 948 F.2d at 1517; *Andersen Bros.*, 729 F.3d at 937. The Court must now determine whether the same is true of administrative actions brought pursuant to CECRA.

CECRA is Montana's analog to CERCLA, and has a similar structure and liability scheme as its Federal counterpart. As with CERCLA, under CECRA a PLP's "substantive rights and ultimate liability are affected from the start of the administrative process," early involvement often benefits the PLP, and a PLP's lack of cooperation may expose the insured to a very real risk of increased liability. *See Pintlar*, 948 F.2d at 1516-18. For example, after MDEQ has informed

15

a party in writing that it has been identified as a PLP pursuant to Montana Code

Annotated § 75-10-715(1), and requested that it "take appropriate remedial

action," if the party is "unable or unwilling to take action in a timely manner," the

party "may be required to reimburse the fund for the state's remedial action costs

and may be subject to penalties pursuant to this part." Mont. Code Ann. § 75-10-

711(3)(b)-(c) (2013).[4] Specifically, if a PLP fails to "properly provide remedial

action upon notification by the department pursuant to 75-10-711(3), the person

may be liable for penalties in an amount not to exceed two times the amount of

any costs incurred by the state pursuant to this section." Mont. Code Ann. § 75-10-

715(3) (2013).

Similarly, the MDEQ is authorized to issue to a PLP any "cease and desist,

remedial, or other orders as may be necessary or appropriate to protect the public

health, safety, or welfare or the environment." Mont. Code. Ann. § 75-10-711(4)

(2013). A PLP that violates such an order "may, in an action brought to enforce

the order, be assessed a civil penalty of not more than $10,000 for each day in

---

[4]     This is the statutory provision that the MDEQ cites in its September 23, 2003 PLP
letter, stating that "pursuant § 75-10-711 MCA, DEQ is offering each noticed PLP the
opportunity to properly and expeditiously perform either the permanent or interim remedial
actions described above. If you choose not to conduct one of the remedial actions, DEQ may
conduct the actions itself and recover its costs or it may issue an order or initiate a civil action
requiring you to perform the actions. Failure or refusal to comply will evidence that the PLP is
not properly or expeditiously performing the above remedial actions and may subject that PLP to
penalties as provided under CERCLA." (Doc. 119-1 at 44.)

which a violation occurs or a failure or refusal to comply continues." Mont. Code Ann. § 75-10-711(5)(a) (2013). In the alternative, "the department may assess penalties of not more than $1,000 a day for each violation" against a PLP that "failed to comply with an order issued by the department pursuant to 75-10-711(4)." Mont. Code Ann. § 75-10-714(1) (2013).

Furthermore, one of the three express purposes of CECRA is to "encourage private parties to clean up sites within the state at which releases of hazardous or deleterious substances have occurred . . . ." Mont. Code Ann. § 75-10-706 (2013). The statute equips the MDEQ with a variety of tools it may use to "encourage" – rather than force through the filing of a civil action – PLPs to remediate CECRA sites. Thus, voluntary settlements and remediations are integral to achieving CECRA's stated purpose. As with CERCLA, coverage in connection with CECRA should not depend on whether the MDEQ chooses to avail itself of an administrative remedy or elects to proceed directly to litigation. *See Pintlar*, 948 F.2d at 1517.

If the absence of a suit constituted grounds to deny a defense, when faced with a CECRA administrative proceeding, a PLP's most logical reaction would be to flout any MDEQ requests or orders and wait to be served with a complaint. The Court cannot fathom how this result serves any of the parties involved, much less

the overall purpose behind the statute. The carefully crafted administrative remedies entrusted to MDEQ would lose all practical effect, since noncompliance would almost certainly become the pervasive response. The MDEQ would be forced to eventually litigate in situations where an administrative remedy is apparent, attainable, and agreed upon by all interested parties, and in situations where the administrative process, if permitted to run its proper course, might result in an acceptable and expedient resolution at the fraction of the cost of litigation. Litigation is a far costlier approach for all parties – including insurers – and is simply not the means best suited to attain the purpose of CECRA in every instance, as evidenced by the other statutorily provided remedies. Finally, expeditious remediation of contaminated lands would become all the more difficult if litigation, or foot-dragging as a means to bait litigation, became the order of the day.

Given the similarities between the two statutes, the Court finds that the reasoning supporting the decision in *Pintlar* applies with equal force in the context of CECRA. Additionally, *Pintlar* corresponds directly with Montana's duty to defend statute, that an insurer "is bound on request of the person indemnified, to defend actions *or proceedings* brought against the person indemnified." Mont. Code Ann. § 28-11-316 (2013) (emphasis added). Inclusion of the term

"proceedings" indicates that absent a contrary intention on the face of the insurance contract, Mont. Code Ann. § 28-11-313 (2013), the commencement of a suit is not required for the duty to arise. Therefore, "proceedings," like those formally commenced by MDEQ against Pacific through its letter of September 23, 2003, are sufficient to trigger the duty to defend.

Administrative proceedings commenced pursuant to CECRA, evidenced by notice that an insured has been identified as a PLP, constitute a "suit" under the proven Great American policies.[5]

## B.    The Unequivocal Demonstration Standard Applies to PLP Notices

Great American does not directly address *Pintlar*, let alone set forth an argument as to why the court's analysis in that case is not equally applicable here. However, Great American asserts closely related arguments, pointing to a series of Montana cases to support its position that Pacific only notified it of a "potential claim," and that a "complaint" is required to trigger the "unequivocal demonstration" standard that Pacific claims should govern the question of whether

---

[5]        Numerous other courts have reached similar conclusions, holding that PLP/PRP letters issued pursuant to various state CERCLA equivalents constitute "suits" under CGL policies. *See Nucor Corp. v. Employers Ins. Co. of Wausau*, 296 P.3d 74, 81 (Ariz. 2012) ("we agree with the trial court that receipt of the ADEQ letter triggered Wausau's duty to defend Nucor in the ADEQ proceeding"); *Jostens, Inc. v. Federated Mut. Ins. Co.*, 612 N.W.2d 878, 885 (Minn. 2000) ("the term 'suit,' as used in a comprehensive general liability policy, includes actions taken by the Minnesota EPA in the form of an RFI").

the PLP Letters were sufficient to trigger Great American's duty to defend.

The unequivocal demonstration standard is well established under Montana law. Generally, the "duty to defend arises when a complaint against an insured alleges facts, which if proven, would result in coverage." *Staples*, 90 P.3d at 386. "Where a complaint alleges facts which represent a risk outside the coverage of the policy but also avers facts which, if proved, represent a risk covered, the insurer is under a duty to defend." *Id.* (quoting *Atcheson v. Safeco Ins. Co.*, 527 P.2d 549, 552 (Mont. 1974)). "When a court compares allegations of liability advanced in a complaint with policy language to determine whether the insurer's obligation to defend was 'triggered,' a court must liberally construe allegations in a complaint so that all doubts about the meaning of the allegations are resolved in favor of finding that the obligation to defend was activated." *Id.* (citing *Portal Pipe v. Stonewall*, 845 P.2d 746, 749 (Mont. 1993); *Grindheim*, 908 F.Supp at 805). "Unless there exists an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage, an insurer has a duty to defend." *Id.* (citing *Insured Titles, Inc. v. McDonald*, 911 P.2d 209, 212 (Mont. 1996). "[I]f there is any dispute as to the facts relevant to coverage, those factual disputes must be resolved in favor of coverage." *Id.* (citing *Insured Titles, Inc.*, 911 P.2d at 212). The Montana Supreme Court has "repeatedly admonished

insurers" facing a coverage question to "defend the insured and file a declaratory judgment action to discern coverage." *State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 415 (Mont. 2013).

Great American argues that because no complaint had been filed against Pacific, the March 25, 2004 claim letter constituted notice of a potential claim only, and that since an insurer's duty to defend cannot be measured against a potential claim, the "unequivocal demonstration" standard is inapplicable here. Great American is correct with respect to the City of Bozeman: Pacific states that "it is possible that the City of Bozeman will, in the future assert a cost contribution claim against Pacific" (Doc. 119-2 at 2). Great American is also correct that Pacific admitted in the claim letter that "[n]o lawsuit has been filed against Pacific" (*Id.*). However, Great American fails to mention that Pacific had been identified as a PLP under CECRA in the first paragraph of the claim letter. Given the Court's ruling that a PLP notice constitutes a "suit," it rejects Pacific's assertion that it was only on notice of a potential claim.

Next, Great American cites numerous cases for the proposition that a complaint must be filed in order for a duty to defend to arise through application of the "unequivocal demonstration" standard. (Doc. 133 at 20-21.) In *Grindheim*, United States District Judge Paul Hatfield wrote that Montana's duty-to-defend

rule "contemplates the institution of an action by a claimant against the insured." 908 F.Supp at 798. In *Atchison v. Safeco Insurance Company*, the Montana Supreme Court wrote, "[i]t is to the allegations of the [underlying complaint] that we look to determine whether or not there is a duty to defend." 527 P.2d 549, 552 (Mont. 1974). In *Graber v. States Farm Fire & Casualty Company*, the Court wrote, "[t]he general rule is that the insurer has a duty to defend when a complaint filed against its insured sets forth facts which bring the event within the policy provisions." 797 P.2d 214, 217 (Mont. 1990). In *Staples*, the Court noted that the "duty to defend arises when a complaint against an insured alleges facts, which if proven, would result in coverage." 90 P.3d 381, 385 (Mont. 2004) (citations omitted). Most recently, in *Newman v. Scottsdale Insurance Company* the Court quotes *Staples*, reaffirming that "[t]he insurance company must look to the allegations of a complaint to determine if coverage exists under an insurance policy, thus giving rise to the insurer's duty to defend." 301 P.3d 348, 354 (Mont. 2013).

The Court must now determine whether under Montana law, an underlying complaint must have been filed against the insured for the insurer's duty to defend to arise through application of the "unequivocal demonstration" standard.

As an initial matter, in all of the cases Great American cites, a complaint

had been filed,[6] and the courts were tasked with determining whether coverage existed. Thus, none of those cases address the question of whether a complaint is required in all instances, or if there are some situations in which an insured may properly "set forth facts which represent a risk covered by the terms of an insurance policy" through some other means. *Staples*, 90 P.3d at 385; *see also Haskins Const., Inc. v. Mid-Continent Cas. Co.*, 2011 WL 5325734, *2 (D. Mont. Nov. 3, 2011) ("An insurer has a duty to defend if an insured alleges facts that, if proven, would result in coverage").[7]

---

[6] *See Grindheim*, 908 F. Supp. at 798 ("Analysis of the parties' respective positions must necessarily begin with a review of the allegations of the complaint filed in the Grindheim action"); *Atcheson*, 527 P.2d at 552 ("Considering the allegations of the Alaskan complaint and the relevant portions of the Safeco policy we find the trial court did not err in its conclusion ordering Safeco to defend in the Alaska litigation"); *Graber*, 797 P.2d at 215 ("On November 6, 1985, Graber was served with a complaint filed by Alaska Northwest Publishing Co. in the United States District Court for the Western District of Washington. In its complaint, Alaska Northwest alleged that a portion of its publication, *The Milepost,* was copied by Graber in his publication, *Travel Guide.* Graber gave notice of the lawsuit to State Farm by filling out a 'Fire and Casualty Claim Report' form in agent Andrews' office in Kalispell"); *Staples*, 90 P.3d at 385-86 ("However, rather than accepting the allegation in the amended complaint that Corcoran owned the horse as true, Bickler looked at evidence outside the amended complaint and, although he conceded the evidence was conflicting, he made a unilateral determination that Corcoran did not own Frenchy at the time of the accident"); *Newman*, 301 P.3d at 354 ("Therefore, in accordance with *Staples* we look to the facts alleged in Newman's Third Amended Complaint vis-à-vis Teen Help, to determine whether these facts, if proven, would present a claim covered by the policy").

[7] The insurers in *Pintlar* advance a similar argument by pointing to "dicta" in *Kootenai County v. Western Casualty & Surety*, 750 P.2d 87, 90 (Idaho 1988), in which the Idaho Supreme Court, quoting *Idaho v. Bunker Hill Co.*, 647 F.Supp 1064, 1068 (D. Idaho 1986), held that "[t]he duty to defend arises upon the filing of a complaint whose allegations, in whole or in part, read broadly, reveal a potential for liability that would be covered by the insured's policy." *Pintlar*, 948 F.2d at 1517. However, the *Pintlar* court draws the same distinction

Given the Court's holding that a PLP notice is sufficient to trigger an insured's duty to defend under the policy language here, Great American's argument fails. There is simply no good reason, nor any basis in law, for the Court to either ignore or construct an alternative to the unequivocal determination standard in this novel situation where the commencement of a CECRA administrative proceeding, and not a complaint, triggers the duty to defend. Yet again, *Pintlar* is directly on point:

> The rationale behind defending insureds when a complaint has been filed is that, traditionally, that is when the jeopardy to the insureds' rights can be adversely affected. The focus should be on the underlying rationale and not the formalistic rituals. If the threat is clear then coverage should be provided. The filing of an administrative claim is a clear signal that legal action is at hand.

*Pintlar*, 948 F.2d 1507, 1517-18.

Accordingly, the Court will look to the September 23, 2003 PLP letter, as well as the other letters exchanged between MDEQ and Pacific prior to Pacific's March 25, 2004 request for a defense (collectively, "PLP Letters") to determine whether through them, the "insured sets forth facts which represent a risk covered

---

between *Kootenai* as this Court now draws between the instant case and those cases Great American cites for the proposition that a complaint is necessary, stating: "However, in *Kootenai* the issue whether the duty to defend can arise only upon the filing of a complaint was not before the court. Instead, the court held that the insurer was put on notice of its duty to defend after it received notice of a complaint filed against the insured alleging negligent acts within the policy coverage." *Id.* (citing *Kootenai*, 750 P.2d at 93).

by the terms of the insurance policy," *Staples*, 90 P.3d at 385 (internal citations omitted), as determined by applying an unequivocal demonstration analysis. Thus, for the purposes of such an analysis, the PLP Letters will be regarded as the equivalent of a complaint.

## V.   ANALYSIS

The September 23, 2003 letter reaffirmed that Pacific had been identified as a PLP, and stated that an investigation revealed "lead, asbestos, and some organics were present at the [Site] at levels that posed an imminent threat." (Doc. 119-1 at 42.) The letter provided Pacific the opportunity to perform either a permanent or interim remedial action. Pacific was advised that failure to perform either remedial action may result in an administrative or civil action for cost recovery or to perform the work.

In a letter sent to Pacific dated November 10, 2003, MDEQ staked out the position that Pacific did in fact lease a portion of the Site, upon which it operated a salvage operation from 1956 to 1988. (Doc. 142-1 at 6.) The letter advised Pacific that under CECRA, PLPs are strictly, jointly and severally liable for remediation, and that such liability is not altered or diminished by the fact the Pacific did not own or operate the entire facility. (*Id.*)

In a November 26, 2003 letter, MDEQ states:

> Because Pacific Hide and Fur Depot owned or operated a
> portion of the facility at the time hazardous and deleterious
> substances were disposed of there, and/or Pacific Hide and
> Fur Depot generated hazardous or deleterious substances
> that were disposed of at the facility and/or Pacific Hide and
> Fur Depot transported or arranged for the transportation of
> hazardous or deleterious substances to the facility, Pacific
> Hide and Fur Depot is strictly, jointly and severally liable
> for remediation of the entire facility.

(Doc. 142-1 at 17.) MDEQ clarifies that while other PLPs have undertaken

voluntary cleanup actions, those actions do "not necessarily reduce the liability of

any other PLP for remediation of the facility. All PLPs remain strictly, jointly and

severally liable for all cleanup costs at this time." (*Id.* at 18.)

Finally, a December 2, 2003 letter again reiterates that although Pacific may

not have owned or operated the entire facility, and even if it did not generate or

transport asbestos there, "the fact that it is a PLP makes it strictly, jointly and

severally liable under CECRA for remediation of all hazardous or deleterious

substances throughout the entire facility." (Doc. 142-1 at 20.) The allegations

contained in the PLP Letters carry with them "immediate and severe implications,"

and unequivocally notify Pacific, and Great American, that "legal action is at

hand." *Pintlar*, 948 F.2d at 1516-18.

The Court must now determine whether the PLP Letters allege "facts, which

if proven, would result in coverage" under the Great American policies. *Staples*,

90 P.3d at 385. "Unless there exists an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage, an insurer has a duty to defend." *Id.* (citing *Insured Titles, Inc. v. McDonald*, 911 P.2d 209, 212 (Mont. 1996). "[I]f there is any dispute as to the facts relevant to coverage, those factual disputes must be resolved in favor of coverage." *Id.* (citing *Insured Titles, Inc.*, 911 P.2d at 212). Applying these standards to the PLP Letters, they establish that Pacific operated a battery salvage operation on a portion of the Site that it leased from 1956 to 1988. Lead from the salvage operation contaminated soil at the Site, creating hazardous waste requiring cleanup. Quite simply, as a PLP, Pacific faces nothing short of the sole and complete financial responsibility associated with removal and/or remediation of all contamination at the entire Site consistent with standards imposed by the MDEQ. The PLP Letters will therefore trigger Great American's duty to defend absent an unequivocal demonstration to the contrary.

Through its initial denial letter and its various briefs filed in connection with the motions for summary judgment now before the Court, Great American advances numerous arguments as to why the claims asserted against Pacific are not covered under the policies. The Court first turns to Great American's April 27, 2004 letter, which denies coverage more than thirteen months after Pacific

tendered its request for defense and indemnification. The letter addresses the applicability of sixteen "Great American policies allegedly issued to Pacific," advancing three separate grounds for denial, each of which applies to several of the policies in a patchwork fashion.

Great American first asserts a lost policy defense as to five of the alleged policies. Even if the Court found in Great American's favor regarding these alleged lost policies, prior to denial, Pacific provided Great American with copies of the five proven policies, effective between December 1966 and December 1971. The proven policies also fall outside of the second basis for denial, the sudden and accidental pollution exclusion, since as Great American states, that exclusion was not included in its policies until 1973. Thus, even if the Court ruled in Great American's favor on both of its first two grounds for denial, Great American would still owe a duty to defend on the five proven policies.

Great American's third basis for denial, the owned property exclusion, targets all but three of the policies, including all five of the proven policies. The owned property exclusion cited in the denial letter and contained within the proven policies states that the policies do not apply to "property damage to property owned or occupied by or rented to the insured." (*See, e.g.,* Doc. 119-5 at 7.) Great American claims that because Pacific leased the property at issue, there

is no coverage. This conclusion, however, cannot withstand application of the

unequivocal demonstration standard, nor the sting of CERCA's scheme of joint

and several liability: The PLP Letters clearly allege that Pacific is liable for

property damage to the entire Site – including property that Pacific never leased or

owned.[8] Additionally, there is support for the position that owned property

exclusions do not apply in situations where the government initiates a suit or

proceeding to prevent or remediate environmental damage. This position is based

on a concept articulated powerfully in the case that has become this Court's north

star in its resolution of these motions: "In addition to the loss to the actual owners

of the contaminated land, the government also sustained 'property damage' to its

quasi-sovereign interest in environmental resources." *Pintlar*, 948 F.2d at 1514.

*See also Unigard Mut. Ins. Co. v. McCarty's, Inc.*, 756 F. Supp. 1366, 1369 (D.

Idaho 1988) ("In this suit the EPA alleges that the PCB dumping has harmed the

environment and endangered the public. The EPA is not bringing this suit to

---

[8] The Ninth Circuit addressed this issue in *Reese v. Travelers Ins. Co.*, 129 F.3d 1056, 1060-61 (9th Cir. 1997), in which an insurer denied a defense based in part on an owned property exclusion identical the exclusion in Great American's proven policies. The underlying complaint in that case alleged that the insured caused property damage in the form of groundwater contamination beyond the insured's land. Despite evidence that the contamination was in fact limited to the insured's land, the Ninth Circuit reversed the district court, reaffirming the principle that it is the allegations that control, even if those allegations are false. *Reese*, 129 F.3d at 1061. The court held that the owned property exclusion did not excuse the insurer from defending the insured because the underlying complaint alleged damage to property that was not owned occupied or rented by the insured. *Id.*

restore defendants' land for defendants' benefit. Instead, the suit is brought on behalf of a third party—the public. The policy provides third-party coverage. Thus the Court cannot find as a matter of law that coverage is excluded under the owned-property provision").

The Court's analysis as to the denial letter need go no further. At the very least, Great American failed to demonstrate unequivocally that the allegations in the PLP Letters trigger coverage under the five proven policies. Coverage under these policies renders any discussion of the additional policies superfluous, as coverage under even a single policy is sufficient to trigger Great American's duty to defend the entirety of MDEQ's claims. *See State Farm Fire and Cas. Co. v. Schwan*, 308 P.3d 48, 51 (Mont. 2013) ("Montana follows what other courts have termed the 'mixed-action' rule . . . which requires an insurer to defend all counts in a complaint so long as one count potentially triggers coverage, even if the remaining counts would not be covered"); *Newman v. Scottsdale Ins. Co.*, 301 P.3d 348, 356 (Mont. 2013) ("a duty to defend is triggered where one portion of the complaint alleges facts which, if proven, would result in coverage, even if the remaining counts of the complaint would not be covered").

Finally, the Court turns to one of the final paragraphs in the denial letter, which states, in relevant part:

There are several exclusions, conditions and policy provisions, beyond those set forth above, that negate, limit or otherwise control your client's tender for defense and indemnity. Other exclusions which have not been located may also limit or exclude coverage. For example, to the extent your client's claim is not based on "property damage," an "occurrence," or was based on property damage that was "expected" or "intended," there may be no coverage under the policies. To the extent your client's contamination problem is limited to soil contamination, the owned property exclusions in the policies bar coverage.[9] To the extent that your client's tender was not timely, or coverage for pre-tender costs is requested, coverage will be denied.

(Doc. 86-10 at 5). This language is vague, general, and equivocal. The Court interprets this provision merely as an attempt to reserve numerous other possible grounds for denial for which Great American offers no meaningful support. If Great American wished to address or reserve its position on these potential exclusions and defenses, it could have raised them as part of a separate declaratory judgment action after defending under a reservation of rights. The Court assigns this paragraph no weight, as it does not unequivocally demonstrate anything.

The Court now turns to the new arguments Great American advances in its motions for summary judgment and in response to Pacific's motion for summary

---

[9] Great American already addressed the owned property exclusion in detail in the preceding section of the denial letter. Mention of the owned property exclusion here feeds the Court's suspicion that this paragraph is largely stock language intended to keep as many avenues open as possible.

judgment. Before doing so, however, the Court makes two general observations regarding these arguments and briefs *in toto*. First, the bulk of Great American's briefing could easily be mistaken for briefing on a declaratory judgment action brought by Great American after tendering a defense to the CECRA claims under a reservation of rights. However, Great American opted not go that route, choosing instead to take the riskier path by denying coverage after researching MDEQ's claims, and making "unilateral determinations" as to several questions of fact. *Staples*, 90 P.3d at 386. As a result of Great American's decision, the Court is presented not with a coverage action, but a claim for breach of the duty to defend. Great American's arguments are far less suited to this purpose. This is not the first time the Court has reminded Great American that this is an action for breach, not for coverage. (Doc. 114, *passim.*) Additionally, several of Great American's arguments attempt to turn the unequivocal demonstration standard on its head, essentially requiring Pacific to prove coverage before Great American was required to provide a defense. Such a reversal will not be permitted, as the law is clear that denial of a defense is the exception, not the rule.

Great American raises the issue of whether liability arose from an "occurrence." The problem with this argument becomes immediately apparent upon reading its point heading, in which Great American claims that it is entitled

to summary judgment as to each policy because "Pacific cannot establish that its liability arose from an occurrence." Pacific was under no such obligation when seeking a defense. This is precisely the type of argument that Great American could have advanced in a declaratory judgment action, but that has no place here – particularly since it was only raised in passing in the denial letter. Furthermore, Great American relies on considerable material outside of the PLP Letters gathered in the course of this litigation, which includes disputed issues of fact regarding who released what contaminants at the Site, when they did so, and the intent of those who released those contaminants. This falls far short of an unequivocal demonstration that there was no coverage, and is at best a *post hoc* attempt to create a question of fact that wholly ignores controlling law.

Great American next raises the issue of untimely notice based on two provisions contained in the five proven policies that require notice of an "occurrence" as defined under the policies, and notice of a "claim or suit brought against the insured." Pointing to evidence that Pacific knew of contamination as early as 1988, and to MDEQ's initial PLP letter dated January 2, 1996, Great American argues Pacific failed to comply with the provisions by withholding notice until March 25, 2004. While Great American may have ultimately succeeded in avoiding liability on the basis of failure of notice, two missteps

prevent it from doing so here.

First, Great American did not raise this defense in its denial letter, other than in a generic paragraph in which it attempted to cursorily reserve several defenses. In the recent case of *Newman v. Scottsdale*, an insured was served with a complaint in December of 2008. The insurer first learned of the complaint in January of 2010 when the insured submitted a policy demand letter. The following month, the insurer denied coverage on a number of grounds, which did not include the insured's failure to notify. In August of 2010, the insured sued for breach of the duty to defend. Finally, in its March 2011 response to insured's motion for summary judgment, the insurer argued for the first time that the insured failed to provide timely notice of the lawsuit. The Montana Supreme Court acknowledged that:

> Numerous jurisdictions have held that where an insurer denies liability on some other policy or coverage ground, the insurer cannot thereafter rely on the insured's failure to give reasonable notice as a ground for avoiding liability. In other words, the insurer waives its right to argue "failure of notice" once it has denied coverage on other grounds.

*Newman v. Scottsdale*, 301 P.3d 348, 360 (Mont. 2013). After citing several such cases, the Court held that "by denying liability on other grounds for over a year after notice of the claim, [the insurer] waived its right now to rely on defects in notice." *Id.* The Court went on to reject the insurer's prejudice argument because

34

"logically, once one waives the right to invoke an argument, the various components of that waived argument – including, as here, prejudice resulting from lack of notice – are simply not relevant." *Id.* at 361.

Newman is directly applicable here. The April 27, 2005 denial letter, sent more than a year after Pacific requested a defense, does not discuss failure to notify. To the Court's knowledge, the first time Great American raises notice in any meaningful way is in its Answer in this case, filed on June 15, 2012 (Doc. 14 at 7, ¶ 2.3.) Great American has waived its right to rely on inadequate notice or any resulting prejudice at this late hour. Additionally, Great American is estopped from raising the issue of notice because its argument is reliant upon its independent resolution of questions of fact. *See Staples*, 90 P.3d at 386-87. Furthermore, the "facts" upon which Great American bases its argument were gathered *after* it denied a defense. Therefore, an unequivocal demonstration that Pacific failed to comply with the notice provisions did not exist before Great American refused to defend. *See Newman*, 301 P.3d at 359 ("there must exist an unequivocal demonstration that the claim against the insured does not fall within the policy coverage before an insurer can refuse to defend; otherwise, the insurer has a duty to defend" (internal citations omitted)).

The Montana Supreme Court has "repeatedly admonished insurers" facing a coverage question to "defend the insured and file a declaratory judgment action to discern coverage." *State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 415 (Mont. 2013). This was the proper course of action for Great American to follow in this situation.

Great American's duty to defend was triggered when it was presented with Pacific's request for coverage and the PLP Letters. By denying the request, Great American breached its duty.

## VI.    GREAT AMERICAN'S REMAINING DEFENSES

Pacific Hide moves for summary judgment on the remaining affirmative defenses set forth in Great American's Answer to the Amended Complaint. In its response, Great American withdrew the majority of its defenses. (Doc. 134 at 26.) Because all the defenses Great American did not withdraw have been addressed and resolved in this order, the Court will deny Pacific's motion as moot.

## VII.    DAMAGES

Having found that Great American breached its duty to defend, the Court must determine the damages that flow from the breach. Under Montana law, "where the insurer refuses to defend and does so unjustifiably, that insurer becomes liable for defense costs and judgments." *Staples*, 90 P.3d at 386 (internal

citations and quotation marks omitted); Mont. Code Ann. § 28-11-316 ("If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the person indemnified suffered by the person indemnified in good faith is conclusive in favor of the person indemnified against the person indemnifying"). Accordingly, Pacific Hide is entitled to entry of judgment in the amount of the consent judgment it paid to the City of Bozeman, $650,000, plus its attorney's fees incurred during the CECRA proceedings, as well as post-judgment interest of 10% per annum pursuant to Montana Code Annotated § 25-9-205 and § 27-1-211.

Pacific is also entitled to attorney's fees for this breach of contract and declaratory judgment action. The Court firmly believes that the parties can resolve the issue of attorney's fees without its intervention, and will issue an order consistent with that view.

## VIII. CONCLUSION

Defendant Great American Insurance Company breached its duty to defend Plaintiff Pacific Hide & Fur Depot against the CECRA administrative proceedings. Accordingly,

IT IS ORDERED that:

(1)    Pacific Hide's motion for summary judgment regarding Great

American's duty to defend (Doc. 121) is GRANTED.

(2)     Great American's motion for summary judge (Doc. 115) is DENIED.

(3)     Pacific Hide's motion for summary judgment on Great American's remaining defenses (Doc. 123) is DENIED as moot.

(4)     Judgment shall be entered in favor of the Plaintiff, Pacific Hide & Fur Depot in the amount of $650,000, plus attorney's fees incurred in the CERCA/CALA process. Plaintiff is entitled to any applicable post-judgment interest, to be determined in accordance with Montana's statutory interest rate.

The Court firmly believes that the amount of attorney's fees owed to Pacific Hide in connection with this breach of contract and declaratory judgment action is most appropriately resolved by the parties without the Court's intervention. An amicable and independent resolution of this issue will not only conserve scarce judicial resources, but will save the parties and their counsel the time and expense associated with formal proceedings before the Court. Accordingly,

IT IS FURTHER ORDERED that counsel for Pacific and Great American shall meet within 15 days of the date of this order, either in person or telephonically, for the purpose of determining Pacific's attorney's fees. The parties shall have until 30 days from the date of this order to negotiate and agree upon a

fee amount. The parties shall file joint notice by that date stating whether they have resolved the issue, or whether the Court must determine the appropriate award of fees and expenses. Should the parties notify the Court that they are unable to resolve this matter, the Court will issue a scheduling order for briefing that will supplant the standard schedule set forth in Rule 54(d)(2) of the Federal Rules of Civil Procedure.

This order fully resolves Phase I of this matter, which the Court bifurcated in its September 27, 2012 scheduling order (Doc. 35). Consistent with that order, the Court will now set a status conference for the purpose of setting a schedule and deadlines for further pretrial proceedings related to Phase II.

IT IS FURTHER ORDERED that Counsel for all remaining parties shall participate in a telephonic scheduling conference for the purpose of setting a schedule and deadlines for the remainder of this case on **June 3, 2014 at 4:00 p.m.** Counsel will be advised of the conference line number at a later date.

IT IS FURTHER ORDERED that Counsel for all remaining parties shall collectively construct and file a proposed schedule that shall include deadlines for amending the pleadings, simultaneous disclosure of all liability experts and Plaintiff's damages experts, disclosure of Defendants' damages experts, and close of discovery. The proposed schedule shall be filed on or before **May 30, 2014**.

Dated this 23rd day of May, 2014.

Dana L. Christensen, Chief District Judge
United States District Court